**UNITED STATE DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JANE DOE (B.N.T.) an individual,

Plaintiff,

v.

WYNDHAM HOTELS & RESORTS, INC.;
WYNDHAM HOTEL GROUP, LLC;
WYNDHAM HOTEL & RESORTS, LLC
d/b/a LAQUINTA INN & SUITES;
WYNDHAM HOTELS AND RESORTS;
LAQUINTA FRANCHISING, LLC;
LAQUINTA HOLDINGS, LLC; LQ
MANAGEMENT, LLC; CPLG TX
PROPERTIES

Defendants.

Civil Action No.:

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Jane Doe (B.N.T.), Plaintiff in the above-styled and numbered cause, files this Original Complaint against WYNDHAM HOTELS & RESORTS, INC., WYNDHAM HOTEL GROUP, LLC; WYNDHAM HOTEL & RESORTS, LLC D/B/A LAQUINTA INN & SUITES; WYNDHAM HOTELS AND RESORTS; LAQUINTA FRANCHISING, LLC; LAQUINTA HOLDINGS, LLC; LQ MANAGEMENT, LLC; CPLG TX PROPERTIES, as Defendants, and would respectfully show the Court and jury as follows.

## SUMMARY

1.     Jane Doe (B.N.T.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

1

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1] To "harbor" means to "give shelter or refuge to."[2] Trafficker or 'pimps', who use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will, often use hotels to harbor their victims.

3.      Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[3] Trafficker often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[4]

4.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for trafficker and sex buyers.

5.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] _Doe v. Hotels_, 6:23-CV-1012, 2024 WL 2955728, at *6 (M.D. Fla. June 12, 2024) (quoting Merriam-Webster Dictionary).
[3] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[4] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/

criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where trafficker could exploit victims, including victims like Jane Doe (B.N.T.) with minimal risk of detection or interruption. Defendants continued supporting trafficker, including Jane Doe (B.N.T.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

8.      Jane Doe (B.N.T.) is a resident of Georgia. She may be contacted through her lead counsel, whose information is contained below.

9.      B.N.T. is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud, or coercion, to commit a commercial sex act.

10.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of B.N.T.

11.     Wyndham Hotels & Resorts, Inc., f/k/a Wyndham Worldwide Corporation ("WHR") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It may be served through its registered agent for service Corporate Creations Network Inc. at 1521 Concord Pike Suite 201, Wilmington, Delaware 19803. Defendant WHR is the successor entity to the hotel business of Wyndham Worldwide Corporation and its former subsidiaries. Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its

predecessor subsidiaries related to franchising, controlling, ownership and operating the Subject La Quinta. All references to WHR include the acts and omissions of predecessor entities for which WHR is responsible, including Wyndham Worldwide Corporation and its former subsidiaries.

12.     Wyndham Hotel Group, LLC ("WHG") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. It can be served by its registered agent Corporate Creations Network Inc. at 1521 Concord Pike Suite 201, Wilmington, Delaware 19803. Upon information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation.

13.     Defendant Wyndham Hotels & Resorts, LLC d/b/a La Quinta Inn & Suites ("Wyndham LQ") is a Delaware company. It can be served by its registered agent Corporate Creations Network Inc, 600 Mamaroneck Ave., Suite 400, Harrison, NY 10528.

14.     Wyndham Hotels and Resorts ("Wyndham") is a for-profit Delaware corporation with its principal place of business in New Jersey. Wyndham Hotels and Resorts may be served through its registered agent for service: Corporate Creations Network, Inc., 3411 Silverside Road Tatnall Building – Suite No. 104, Wilmington, Delaware 19810.

15.     WHR, WHG, Wyndam LQ and Wyndham and referred to collectively as the "Wyndham Defendants" or "Wyndham." Upon information and belief, in 2018 Wyndham purchased La Quinta's management and franchise businesses which it actively operates and controls. Upon information and belief, Wyndham is the successor in interest to LQ Holdings and other predecessor LQ entities with respect to the operation of the subject La Quinta hotel. Wyndham is responsible for the wrongful acts of the predecessor LQ entities (and their agents and alter-egos) that operated, managed, and controlled the subject La Quinta hotels. All references to Wyndham include any predecessor entities.

16.    Upon information and belief, the Wyndham Defendants, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the hotel located at 575 Old Holcomb Bridge Rd., Roswell, GA 30076 ("Subject La Quinta").

17.    La Quinta Franchising, LLC is a Nevada limited liability company with its principal place of business in Parsippany, New Jersey. Defendant La Quinta Franchising, LLC may be served through its registered agent for service Corporate Creations Network Inc. at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

18.    La Quinta Holdings, LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Defendant La Quinta Holdings, LLC may be served through its registered agent for service Corporate Creations Network Inc. at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803. At relevant times, it was an "owner, operator, and franchisor of select-service hotels . . . under the La Quinta brand."[5] Upon information and belief, through a 2013 corporate reorganization, LQ Holdings acquired the assets and liabilities of predecessor La Quinta entities that had previously owned, operated, managed, and/or controlled the subject La Quinta hotel.[6] LQ Holdings is responsible for the wrongful acts of the predecessor LQ entities (and their agents and alter-egos) that operated, managed, and controlled the Subject La Quinta hotel prior to this 2013 reorganization. All references to LQ Holdings include any predecessor entities.

19.    LQ Management, LLC ("LQ Management") is a for-profit Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Defendant LQ Management

[5] https://www.annualreports.com/HostedData/AnnualReportArchive/l/NYSE_LQ_2016.pdf
[6] https://www.sec.gov/Archives/edgar/data/1594617/000119312515104620/d859384d424b4.htm

may be served through its registered agent for service Corporate Creations Network Inc. at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

20.     LQ Management, LQ Franchising, LQ Holdings, and Wyndham (in its capacity as successor) are referred to collectively as the "LQ Brand Defendants."

21.     CPLG TX Properties ("CPLG TX") is a for-profit limited liability company with its principal place of business in Irving, Texas. CPLG TX Properties LLC may be served through its registered agent for service: Cogency Global Inc., 1601 Elm Street, Suite 4360, Dallas, Texas 75201. Upon information and belief, at all relevant times, it owned, operated, controlled, and/or managed La Quinta located at 575 Old Holcomb Bridge Rd., Roswell, GA 30076 ("Subject La Quinta") through inter-organization agreements with the LQ Brand Defendants.

22.     The LQ Brand Defendants, Wyndham Brand Defendants and CPLG TX —which upon information and belief are all successor and/or affiliated entities subject to common ownership and control—are referred to collectively as the "Defendants."

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and all Defendants are residents of New Jersey for purpose of venue under 28 U.S.C. §§ 1391(c).

25.     All Wyndham Brand and LQ Brand Defendants have the same principal place of business, which is in Parsippany, New Jersey, within the District of New Jersey. Corporate activities related to the operation of the Subject La Quinta occurred at this New Jersey headquarters, and documents related to the Subject La Quinta are stored and maintained at this New Jersey headquarters.

## FACTS

I.    **Jane Doe (B.N.T.) is a Survivor of Unlawful Sex Trafficking at the Hotel Owned, Operated, Managed, and Controlled by Defendants.**

26.    Jane Doe (B.N.T.) was trafficked through force, fraud and coercion by her trafficker to engage in numerous commercial sex acts. Her trafficker used physical violence, psychological abuse and manipulation, overt threats of violence to Jane Doe (B.N.T.) and her family, a pattern of threatening and intimidating conduct, Jane Doe (B.N.T.)'s trafficker raped her repeatedly, he threatened to kill her and her family, she was not allowed a phone, money or ID and other extreme restrictions on Jane Doe (B.N.T.)'s freedom, restraints on Jane Doe (B.N.T.)'s freedom of movement, extreme isolation, and coercive control to require her to engage in commercial sex for their financial benefit, including at the Subject La Quinta.

27.    Jane Doe (B.N.T.) first came under the control of her trafficker in 2012. She remained under the continuous control of these trafficker until at least the end of 2016.

28.    At various times between 2012 and 2015, Jane Doe (B.N.T.) was trafficked repeatedly at the Subject La Quinta. Jane Doe (B.N.T.) was trafficked through force, fraud, and coercion by her trafficker and required to engage in numerous commercial sex acts for their financial benefit.

29.    Jane Doe (B.N.T.)'s sexual exploitation repeatedly occurred in rooms of the Subject La Quinta and was facilitated by Defendants.

30.    During the period that she was trafficked at the Subject La Quinta, Jane Doe (B.N.T.)'s trafficking had profound effects on her, including effects on her appearance, demeanor, movements throughout the hotel, and her interactions with others. This manifested in signs of Jane Doe (B.N.T.)'s trafficking that were obvious and apparent to the staff at the Subject La Quinta. These signs included visible injuries on her face and body, nervous and fearful demeanor, signs of

7

paranoia, disorientation, refusal to make eye contact, limited access to clothing, appearing under the influence of illegal drugs, inability to move around the hotel or communicate with others, submissive behavior with her trafficker, lack of personal possessions, and signs of sleep deprivation and poor hygiene. These signs matched "red flags" of trafficking that the hotel industry and each Defendant recognized to be indicators of sex trafficking in a hotel environment.

31. There were obvious signs that Jane Doe (B.N.T.) was being trafficked at the Subject La Quinta such that the Defendants knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

32. Based upon information and belief, LQ Management LLC operated and managed the Subject La Quinta and employed the staff at the Subject La Quinta while CPLG owned and participated in the operation and management of the Subject La Quinta during Jane Doe (B. N.T.)'s trafficking period.

33. At all relevant times, Defendants were directly involved in the relevant operations of the Subject La Quinta and exercised systemic control over the location with respect to operation of the Subject La Quinta. Defendants also retained control over aspects of the operations of the Subject La Quinta directly related to the claims of Jane Doe (B.N.T.).

34. The trafficker of Jane Doe (B.N.T.) and other sex traffickers frequently used La Quinta branded hotels for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of the Subject La Quinta.

## II. The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

35. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking

at their hotel properties. The specific trafficking activity that resulted in the trafficking of Jane Doe (B.N.T.) was pervasive and apparent at the Subject La Quinta named herein.

36.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[7] For years, sex trafficker have been able to reap their profits with little risk when attempting to operate within hotels.[8] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[9] Hotels have been found to account for over 90% of the commercial exploitation of children.[10]

37.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[11]

38.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of

---

[7] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[8] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[9] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[10] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

[11] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

sex trafficking.[12] This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that trafficker and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

39. Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[13] include:

- individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;
- a group of girls who appears to be traveling with an older female or male;
- a group with similar tattoos, which can indicate "branding" by a trafficker;
- individuals showing fear, anxiety, tension, submissiveness and/or nervousness;
- individuals who seem disoriented;
- individuals showing signs of physical abuse;
- individuals showing signs of restrain or confinement;
- individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;
- individuals with signs of untreated illness or injuries;
- individuals who appear to lack freedom of movement;
- individuals who are being constantly monitored and/or escorted around the hotel;
- individuals who avoid eye contact;
- individuals who avoid interactions with others;
- individuals who are not in possessions of their own identification;
- individuals who have few or no personal possessions;
- individuals who dress provocatively;

---

[12] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).
[13] *See id.*

- a high volume of men who are not registered guests entering and exiting a room; and
- individuals who wait in common areas while other men frequent the room.

40.     Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[14] include:

- patrons appeared distressed at check-in;
- the same person reserving multiple rooms;
- rooms paid for with cash or prepaid cards;
- rooms are paid for one day at a time;
- requests for isolated rooms or rooms close to an exit;
- use of hotel computers for adult oriented or sexually explicit websites;
- patrons not forthcoming about identifying information when registering;
- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;
- individuals lack identification;
- car in the parking lot is parked so license plate is not visible;
- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and
- individual appears to be giving scripted responses.

41.     Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[15] include:

- constant use of the "Do Not Disturb" sign;
- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
- refusal of cleaning services for multiple days;
- excessive amounts of cash in a room;
- presence of multiple computers, cell phones, pagers, or other technology;
- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;
- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;

---

[14] *See id.*
[15] *See id.*

11

- provocative clothing and shoes;
- constant flow of men into a room at all hours; and excessive amounts of sex paraphernalia in rooms.

42.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[16]  From check-in to check-out, there are indicators that trafficker and their victims routinely exhibit during their stay at a hotel.

43.     The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff. [17]

44.     Before Jane Doe (B.N.T.)'s trafficking at the Subject La Quinta, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, each Defendant acknowledged and recognized these "red flags" specifically as signs of sex trafficking and instructed and trained their staff to identify and investigate them as signs of sex trafficking when observed in the hotel.

45.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that

---

[16] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[17] / Department of Homeland Security, Blue Campaign Toolkit,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.;
www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-
%20Wisconsin%20AG%20Office%281%29.pdf

most individuals involved in prostitution are subject to force, fraud, or coercion.[18] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

46.    The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants may attempt to draw a distinction between commercial sex or prostitution and sex trafficking, but they have long understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[19]

47.    All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

48.    There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being

---

[18] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[19] *Id.*

13

aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.[20]

49.     The most effective weapon against sexual exploitation and human trafficking is education and training.[21]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Trafficker believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[22]

50.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[23]   In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

51.     Given the prevalence of sex trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue

---

[20]https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf

[21] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[22] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[23] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

14

from trafficker without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

52. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

53. Unfortunately for Jane Doe (B.N.T.), Defendants failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (B.N.T.).

## III. Sex Trafficking Has Long Been Prevalent at Defendants' Hotel Properties, and Defendants Have Known About It.

54. Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (B.N.T.)'s trafficking, that sex trafficking was ongoing and widespread at La Quinta branded properties including the property where Jane Doe (B.N.T.) was trafficked.

### A. Sex Trafficking at Wyndham Branded Hotels was well Known by Wyndham Defendants.

55. Upon information and belief, each of the Defendants monitored criminal activity occurring at Wyndham branded hotels including the La Quinta branded locations and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel property where Jane Doe (B.N.T.) was trafficked.

56. Upon information and belief, at all relevant times Defendants adopted a centralized approach to trafficking-related issues at all its branded properties. Defendants' public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the

response of its branded hotels to sex trafficking. Defendants recognized they have a "critical role in increasing awareness and prevention" of sex trafficking in their hotels.[24] Defendants have publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[25] However, Defendants have refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[26]

57.     Unfortunately, while Defendants' statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[27]

58.     The problem of sex trafficking at Wyndham and La Quinta branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex exploitation at Wyndham properties. Although the Wyndham brand publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[28]

---

[24] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

[25] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

[26] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023

[27] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

[28] https://endsexualexploitation.org/wyndham/

16

59.     In the past twenty years, Wyndham-branded properties including La Quinta properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[29]

60.     Information that has become public through news stories establishes the entrenched and pervasive nature of Wyndham branded hotels' role in providing a venue where sex trafficking has continued unabated for years. Upon information and belief, Defendants monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels include:

- In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Wyndham property in California.[30]

- In November 2011, a man was sentenced for sex trafficking after he forced minor girls to engage in commercial sex for his financial benefit, including at a Wyndham property in Virginia.[31]

- In January 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Florida Wyndham property.[32]

- In June 2011, an MS-13 gang member was indicted for trafficking girls at a Wyndham property near Washington, D.C.[33]

- In 2011, news broke that street gangs in California were running an underage-sex-trafficking ring out of two Wyndham properties.

- In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Wyndham property.[34]

- In December 2012, a man was arrested for attempting to entice a 15-year-old

---

[29] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/
[30] https://www.wired.com/2010/11/epps/
[31] Gang member sentenced for sex trafficking in Prince William, News & Messenger (Manassas, Virginia) (November 4, 2011) https://plus.lexis.com/api/permalink/562d85d9-e662-4e4f-8f7f-67b52fa537e8/?context=1530671
[32] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm
[33] https://www.thepublicdiscourse.com/2011/10/4034/
[34] https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635

girl to engage in prostitution at a Wyndham property in Oklahoma.[35]

- In April 2013, two were arrested for trafficking a juvenile girl at an Illinois Wyndham property.[36]

- In June 2013, a man was arrested on human trafficking charges after he forced a woman to engage in commercial sex at hotels, including a Louisiana Wyndham property.[37]

- A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Wyndham property.[38]

- In 2013, a man was arrested at a Wyndham property in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[39]

- In September 2013, a Wyndham property in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[40]

- In November 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at a Wyndham property in Texas.[41]

- In June 2014, two were charged with trafficking a 13-year-old girl at a Minnesota Wyndham property.[42]

- "Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution"[43]

- "Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14"[44]

- "Hagerstown man charged with trafficking of two teenage girls"[45]

---

[35] Man faces new sex-trafficking charges, Tulsa World (Oklahoma ) (March 9, 2013) https://plus.lexis.com/api/permalink/a9062a1a-76b4-4811-89ab-5b0b3c877a88/?context=1530671

[36] https://www.channel3000.com/news/local-news/2-women-accused-of-human-trafficking-at-motel/article_98edf1d4-d231-5ea1-a6b9-e71c83f44750.html

[37] https://www.endslaverytn.org/news/tenn-man-booked-in-human-trafficking-newsarticle

[38] https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction

[39] https://turnto10.com/archive/new-details-in-ardrey-sex-trafficking-investigation

[40] https://www.providencejournal.com/story/news/crime/2013/09/14/20130914-missouri-man-charged-with-sex-trafficking-in-mass-teens-disappearance-ece/35397014007/

[41] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php

[42] https://www.grandforksherald.com/newsmd/moorhead-police-charge-two-with-sex-trafficking-13-year-old

[43] *Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution*, NOLA.com (Jul 20, 2010), Man arrested in Metairie on human trafficking charges; accused of forcing North Carolina teens into prostitution | Crime/Police | nola.com

[44] *Federal officials catch, arrest man alleged to have prostituted Jupiter girl, 14*, The Palm Beach Post (March 31, 2012)

https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/

[45] *Hagerstown man charged with trafficking of two teenage girls,* Herald Mail Media (July 1, 2015) Hagerstown man charged with trafficking of two teenage girls (heraldmailmedia.com)

18

61.     The use of La Quinta hotels for sex trafficking was also well known to Defendants. Scores of news stories dating back as far as 2011, prior to Jane Doe (B.N.T.s) trafficking, highlight the La Quinta Defendants' knowledge of such conduct. Each and every Defendant knew, or should have known, of the use of La Quinta branded hotels for sex trafficking. Among other notable press involving the frequent use of La Quinta hotels for illegal activity, the following was reported:

- "Four Atlanta-area women have been arrested on prostitution charges at a local hotel as part of an FBI-led initiative targeting child exploitation and child prostitution nationwide. The women, ranging in age from 18 to 22, were arrested Friday, July 26, at LaQuinta Inn…";[46]

- "After he dropped [the 15 year-old girl] off at the La Quinta Inn & Suites…last week, the girl solicited an undercover police officer for sex - and was promptly arrested as part of a nationwide FBI-led crackdown on child prostitution.";[47]

- "Raleigh police responded to the La Quinta Inn…where the victim said she was forced into the commercial sex trade, the warrant said;"[48]

- "On May 23, a 16-year-old Georgia girl was found inside the La Quinta Inn… [with a 61 year old man] in Tallahassee. Both were nude when officers with the Tallahassee Police Department arrived;"[49]

- A La Quinta "hotel has been ordered to increase security after complaints of prostitution and nuisance activity. La Quinta Hotel…must now install more security cameras and signs to deter criminal activity. The hotel agreed to do this as part of a settlement with the San Diego City Attorney's office. The San Diego Police Department discovered prostitution at the hotel during several undercover sting operations. Court documents show multiple undercover operations where investigators said they arranged to meet at the hotel with prostitutes through websites."[50]

---

[46] https://www.rockdalenewtoncitizen.com/news/four-arrrested-on-prostitution-charges-as-part-of-fbi-effort/article_19553201-4d38-5036-a0eb-6514d193488e.html
[47] https://www.sfgate.com/crime/article/How-girls-fall-into-clutches-of-pimps-4705407.php
[48] https://www.wral.com/larceny-call-unveils-family-run-sex-trafficking-ring/14031981/
[49] https://www.tallahassee.com/story/news/local/2014/06/02/sex-trafficking-arrests-tallahassee/9856065/
[50] https://www.nbcsandiego.com/news/local/la-quinta-hotel-rancho-penasquitos-san-diego-paseo-montril/2050904/

19

62.     These and other news stories show that the use of La Quintas for sex trafficking was not isolated to one La Quinta or geographic area and the common use of La Quintas for sex trafficking turned into a nationwide problem that stemmed from decisions at the top.

63.     Defendants knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at La Quinta branded hotels, including the subject hotel, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the subject La Quinta frequently and long after the trafficking of the Plaintiff.

64.     These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at La Quinta and other Wyndham branded hotels. Moreover, on information and belief, the Defendants were aware of additional significant law enforcement activity related to trafficking at their hotels that was not reported in the media.

65.     Based on information and belief, the Defendants managed and monitored on-line reviews of La Quinta and other Wyndham branded hotel locations. Examples of reviews reflecting indica of sex trafficking and related criminal activity include:

- A January 2010 review of a Wyndham property in Escondido, California stated: "This is a hooker hangout, doors slaming at 3:00 AM, You will hear pimps on their cellphones outside in the middle of the night. Ladies arriving at 4:00 AM, Management MUST be aware this is going on and condone this. I expected John Walsh to show up with a film crew."[51]

- A February 2010 review of a Wyndham property in Los Angeles, California stated: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he

---

[51] https://www.tripadvisor.com/Hotel_Review-g32358-d235407-i132418454-Super_8_Escondido-Escondido_California.html

was a pimp and that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the vending machines... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[52]

- A 2011 review of a Wyndham property in California stated: "This hotel was the worst I have ever stayed at! The location was terrible! Just a couple blocks from the nice areas but this hotel is used for hookers and drugs according to all the people we spoke to that live in the area!"[53]

- A TripAdvisor review from 2012 for a Howard Johnson in Washington states "Hotel staff was doing nothing about the prostitution going on in theirmidst. Someone reported a drug deal and the staff was only concerned about their money! The carpets were disgusting, beds not made and room with fore hazards! The trash was not removed nor was the bathroom cleaned. Onkaar the owner allows convicts to work for him and let's his front desk staff rip off his tills."[54]

- A February 2012 review of a Wyndham property in Florida stated: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE!!"[55]

- An April 2012 review of a Wyndham property in Texas stated: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[56]

---

[52] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html

[53] https://www.expedia.com/Los-Angeles-Hotels-Knights-Inn-Ontario.h14114.Hotel-Reviews

[54] https://www.tripadvisor.co.za/Hotel_Review-g58537-d100448-Reviews-or40-Howard_Johnson_Inn_Kent-Kent_Washington.html

[55] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

[56] https://www.tripadvisor.ca/Hotel_Review-g56003-d240483-Reviews-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html

- A June 2012 review of a Wyndham property in Florida stated: "Hooker central. People running in and out all night. Bad part of town unless you are looking for hookers. People upstairs running a house with men running in and out all night."[57]

- A March 2013 review of a Wyndham property in Ohio stated: "I've been solicited for drugs and by prostitutes here on several occassions. I told the hotel staff about it and they seem to turn a blind eye to the problem because these people are also buying rooms."[58]

- A July 2013 review of a Wyndham property in California stated: "Our first night we were greeted by undercover police busting the prostitutes using the spare rooms to turn tricks. Maids make extra income unlocking vacant rooms. I would not recommend this place for children. Or anyone for that fact."[59]

- April 28, 2014 Yelp review states "If you have money, don't be cheap and go somewhere that doesn't have prostitutes waiting by the back double doors."[60]

- November 1, 2017 Yelp review states "Crime hot spot. Police are here often. Drugs. Hookers. Good luck you'll need it. Overdose. Crazy people. Not sure if the staff cares or not."[61]

- A Google.com review from 2018 states: "Problem I have is owner. He treats women very poorly and makes his underage children work there. A lot of prostitution that I'm sure owner aware of. I seen him talking to this guy that has checked in 3 different times with 3 different [sic]"[62]

- A Trip Advisor review from June 20, 2014 states: "I witnessed what seemed to be prostitution in and out of the hotel. A huge party went on "in the hallways" well into the night with full tilt hip hop music. The following morning I experienced a naked woman being attacked in the hallway and had to intervene when not one other hotel security, management came to help."[63]

---

[57] https://www.expedia.com/Orlando-And-Vicinity-Hotels-Knights-Inn-Orlando.h1669179.Hotel-Reviews
[58] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html
[59] https://www.tripadvisor.com/Hotel_Review-g32655-d252254-Reviews-or50-Super_8_by_Wyndham_Canoga_Park-Los_Angeles_California.html
[60] https://www.yelp.com/biz/la-quinta-by-wyndham-white-plains-elmsford-elmsford.
[61] https://www.yelp.com/biz/la-quinta-by-wyndham-white-plains-elmsford-elmsford
[62] https://www.google.com/travel/hotels/Days%20Inn%20127%20W%20Byers%20Ave,%20New%20Stanton,%20PA%2015672%20google/entity/CgoIiJGz_YeevpIDEAE/prices?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4926165,4926489,4931360,4936396,4937897,4940607,47061553&hl=en-US&gl=us&ssta=1&q=Days+Inn+127+W+Byers+Ave,+New+Stanton,+PA+15672+google&grf=EmMKLAgOEigSJnIkKiIKBwjnDxAEGBASBwjnDxAEGBEgADAeQMoCSgcI5w8QARgfCjMIDBIvEi2yASoSKAomCiQweDg4MzRkOTA1ZjM5OTA5YmQ6MHgzMjRmOGYwN2ZhY2M4ODg&rp=EIiRs_2Hnr6SAxCIkbP9h56-kgM4AkAASAHAAQI&ictx=1
[63] https://www.tripadvisor.com/Hotel_Review-g60097-d1571552-Reviews-Days_Inn_Suites_by_Wyndham_Milwaukee-Milwaukee_Wisconsin.html

22

- A Booking.com review from September 29, 2021 states: "Negative: The cops pulled us over after we left the parking lot. They told us that this motel was known fir [sic] drugs and sex rings"[64]

66.    This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (B.N.T.) was trafficked at the Subject La Quinta, the Defendants knew or should have known that:

a.    There was widespread and ongoing sex trafficking occurring at La Quinta and other Wyndham branded properties;

b.    Sex trafficking was a brand-wide problem for Defendants;

c.    Defendants and their hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

d.    Defendant's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

e.    Defendants were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

67.    Despite the mounting evidence that sex trafficking at their properties was ongoing and growing, Defendants chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**B.  The Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject La Quinta.**

68.    Sex trafficking was widespread and pervasive at the Subject La Quinta specifically.

69.    The Defendants knew or should have known about the sex trafficking pervasive at their respective Subject La Quinta based on obvious indicators of this activity.

70.    Defendants knew that a population of trafficker, including Jane Doe (B.N.T.)'s trafficker, repeatedly chose to use their respective Subject La Quinta for their sex trafficking

---

[64] https://www.booking.com/hotel/us/days-inn-clarksville-tn.html

23

activity. They selected the hotel because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Subject La Quinta. There were obvious signs of this activity, which were consistent with the well-known "red flags" for sex trafficking in the hospitality industry. As such, Defendants also knew or should have known about the pervasive sex trafficking at their respective Subject La Quinta location based on obvious indicators of this activity.

71.     These traffickers, including B.N.T.'s trafficker, operated with little regard for concealment, due to an implicit understanding between Defendants and the traffickers. This understanding enabled trafficker to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

72.     Upon information and belief, there were other victims being trafficked at the Subject La Quinta at the same time as B.N.T., and there were obvious signs these victims were being trafficked.

73.     Based upon information and belief, the conduct of Defendants facilitated the trafficking of multiple victims by multiple traffickers at their respective Subject La Quinta. Defendants developed a continuous business relationship with these traffickers who operated at the hotels on a routine and repetitive basis.

74.     Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Subject La Quinta prior to Jane Doe (B.N.T.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, and other signs consistent

24

with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their trafficker and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

75.     All knowledge from the staff at the Subject La Quinta is imputed to the respective Franchisee, which employed the hotel staff. Thus, Franchisee knew about the widespread and ongoing trafficking at the Subject La Quinta, including the trafficking of Jane Doe (B.N.T.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed to the Wyndham Defendants based on the existence of an actual agency relationship as described below.

76.     In addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, Defendants learned or should have learned about the obvious signs of widespread trafficking at its hotel, based on non-public sources of information including but not limited to:

- surveillance of the property;

- internal investigations;

- customer complaints;

- monitoring of customer feedback;

- information received from law enforcement;

- and other sources of non-public information available to Franchisee.

25

77.     Upon information and belief, the Defendants knew or should have known about the widespread trafficking at the Subject La Quinta based on the tools they used to monitor and oversee the hotel. The tools they used included:

a.  The obligation of hotel staff and franchisee to report suspected criminal activity, including sex trafficking, to the Defendants;

b.  The Defendants' regular monitoring of online reviews;

c.  The Defendants' collection and monitoring of customer surveys and complaints;

d.  The Defendants' requirement that franchisee submit regular and detailed reports to the Defendants about day-to-day hotel operations;

e.  The Defendants' collection and monitoring of data about guests at the Subject La Quinta, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f.  The Defendants' supervision and control over day-to-day operations of the Subject La Quinta location through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated to allow the Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g.  The Defendants' regular inspections of the Subject La Quinta;

h.  The Defendants' employment of "field agents" to work with hotels on security issues, including trafficking issues;

i.  The Defendants' access to surveillance and security systems;

j.  Information provided to the Defendants by law enforcement; and

k.  Other sources of information available to the Defendants.

78.     The Defendants required hotel staff, management, and franchisees to report suspected criminal activity at the Subject La Quinta, including suspected sex trafficking, to the Defendants.

26

79.     Based on the obvious "red flags" of sex trafficking at the Subject La Quinta, the staff and management of the Subject La Quinta were required to, and upon information and belief did, report numerous instances of suspected sex trafficking to the Defendants before and during Jane Doe (B.N.T.)'s trafficking.

80.     Upon information and belief, before and during Jane Doe (B.N.T.)'s trafficking, the Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the Subject La Quinta based on their supervision and monitoring of the property.

**C. Defendants knew Jane Doe (B.N.T.) was being trafficked at the Subject La Quinta because of the apparent and obvious "red flags" of sex trafficking.**

81.     During the period that Jane Doe (B.N.T.) was trafficked at the Subject La Quinta, there were obvious signs that her trafficker wase engaged in sex trafficking:

- Jane Doe (B.N.T.)'s trafficker would often book multiple rooms for weeks at a time. The hotel staff allowed B.N.T. and other girls trafficked with her to add rooms or days to the to the block of rooms originally booked by Jane Doe (B.N.T.)'s trafficker without question.

- The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards.

- Multiple other girls were being trafficked at the same hotel at the same time as B.N.T. by her trafficker and multiple other trafficker.

- Jane Doe (B.N.T.) was trafficked at the subject Motel 6 locations multiple times, each for one to two weeks at a time.

- Jane Doe (B.N.T.) and her trafficker often requested and were provided with rooms in the back of the subject Motel 6s where there was a clear view of the parking lot and incoming clientele.

- Hotel staff at the Decatur Motel 6 would flirt with B.N.T. and ask how much she charged. Jane Doe (B.N.T.) was forced to have sex with friends and family of various Hotel staff.

- B.N.T.'s significantly older trafficker was often present with B.N.T. at check in.

- The hotel staff saw B.N.T.'s trafficker go to B.N.T.'s room and the rooms of the other girls he was trafficking many times a day.

- Jane Doe (B.N.T.)'s trafficker used the Motel 6s' Wi-Fi to post ads of her and others on Backpage, Craigslist, and other similar sites.

- The "Do Not Disturb" door hanger was used very frequently.

- Jane Doe (B.N.T.), her trafficker, and the other girls she was being trafficked with would often request extra towels.

- Jane Doe (B.N.T.) had between ten and fifteen johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

- There was heavy foot traffic in and out of Jane Doe (B.N.T.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

- When housekeeping was allowed in and after Jane Doe (B.N.T.) checked out, hotel cleaning staff would have noticed sex paraphernalia like condom wrappers, lubricant, and baby wipes.

- Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

82. Based upon information and belief, multiple employees at the Subject La Quinta, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

83. As such, Franchisee knew or was willfully blind to the fact that Jane Doe (B.N.T.) was being trafficked at the Subject La Quinta.

84. Given these obvious signs, the Defendants knew or should have known about the trafficking of Jane Doe (B.N.T.) based on their policies or protocols that required hotel staff to report suspected criminal activity including sex trafficking.

85. The Defendants also knew or should have known about the trafficking of Jane Doe (B.N.T.) based on the numerous tools, described above, through which they monitored and supervised the Subject La Quinta. The "red flags" of Jane Doe (B.N.T.)'s trafficking at this hotel

28

were sufficiently obvious that, during the numerous times she was trafficked at this hotel, they were readily detectable through the oversight tools that the Defendants used.

86.     The Defendants had constructive knowledge of the trafficking of B.N.T. at the Subject La Quinta because that trafficking was the direct result of the Defendants facilitating trafficking at the Subject La Quinta.

87.     Based on their knowledge of the problem of sex trafficking in the hotel industry, at La Quinta and other Wyndham branded hotels, as well as the Subject La Quinta, Defendants each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Subject La Quinta and to make a reasonable investigation in response to signs of potential sex trafficking. If the Defendants had used reasonable prudence, they would have been aware of Jane Doe (B.N.T.)'s trafficking at the Subject La Quinta and that they were benefiting from such trafficking.

IV.     **Defendants actively facilitated sex trafficking at the Subject La Quinta, including the trafficking of Jane Doe (B.N.T.)**

A. **Defendants facilitated the trafficking activity at their Subject La Quinta, including the trafficking of B.N.T.**

88.     Defendants are responsible for the acts, omissions, and knowledge of employees of the Subject La Quinta property when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Defendants ratified these acts and omissions, and because Defendanst failed to exercise reasonable care with regard to the hiring, training, and supervision of their employees given the specific risks, known to Defendants, of human trafficking occurring in the Subject La Quinta.

89.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject La Quinta, Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims.

29

90.    Defendants knew or was willfully blind to the fact that B.N.T. was being trafficked at the Subject La Quinta and, despite this, benefited from continued association with her trafficker by providing them a venue in the form of hotel rooms and related services, to facilitate B.N.T.'s sexual exploitation.

91.    Defendants facilitated widespread trafficking at the Subject La Quinta, including the trafficking of B.N.T., in ways including:

a.    developing relationships with traffickers, including B.N.T.'s trafficker, and creating an understanding that these traffickers could operate at their hotel without risk of interference;

b.    continuing to provide rooms, services, and assistance to trafficker in the face of obvious "red flags" of trafficking of B.N.T. and other victims at the Subject La Quinta;

c.    allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining their front-line staff regarding issues related to human trafficking;

d.    inadequate and inadequately enforced sex trafficking notice and training for their hotel staff;

e.    failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring at the Subject La Quinta;

f.    implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by their hotel staff;

g.    providing rooms at the Subject La Quinta location in a designated area of the property allowing ease of access for "johns" but also minimizing risks of detection; and

h.    accommodating specific requests made by traffickers at the Subject La Quinta.

92.    Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (B.N.T.).

30

93.     Franchisee Defendant knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking at the Subject La Quinta.

94.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject La Quinta, Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

95.     Defendants knew or were willfully blind to the fact that Jane Doe (B.N.T.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing a venue in the form of hotel rooms and related services, to facilitate Jane Doe (B.N.T.)'s sexual exploitation.

96.     Defendants participated directly in aspects of the operation of the Subject La Quinta that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (B.N.T.), as follows:

   a. The Wyndham Defendants have publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including the Subject La Quinta, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

   b. Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels, such as the La Quinta hotels;

   c. Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Wyndham Defendants. The Wyndham Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

   d. Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

31

e. Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

f. Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Wyndham Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

g. Although they delayed making any reasonable effort to do so, the Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

h. Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Wyndham properties, including suspected trafficking incidents;

i. Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject La Quinta;

j. Defendants maintained control over all details of the terms under which franchised hotels, including the Subject La Quinta, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Subject La Quinta;

k. The Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Subject La Quinta, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

l. The Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Subject La Quinta, including trends that would reveal patterns consistent with human trafficking.

97. Defendants directly participated in and retained day-to-day control over renting rooms at all the Subject La Quinta by, among other things:

a. Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

32

b. Defendants directly made reservations for rooms at the Subject La Quinta and accepted payment for those rooms through a central reservation system that they controlled and operated. The Wyndham Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

c. Defendants established and maintained control over a brand-wide "do not rent" system. The Wyndham Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the Subject La Quinta through detailed policies that it established regarding use of this "do not rent" system;

d. Defendants controlled room rates, required discounts, mandatory fees, and rewards program;

e. Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

f. Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g. Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject La Quinta;

h. Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject La Quinta until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i. Defendants required franchisees to use Defendants' property management system, which was owned, maintained, controlled, and operated by the Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

98.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject La Quinta named herein, Defendants continued renting rooms to trafficker, including the rooms used to traffic victims, including Jane Doe (B.N.T.)

99.     Defendants knew or should have known that Jane Doe (B.N.T.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing them hotel rooms and related services to facilitate Jane Doe (B.N.T.)'s sexual exploitation.

100.    Defendants formed a business relationship with trafficker at the Subject La Quinta by renting rooms, collecting guest data, and operating the hotel in a way that attracted business from trafficker and allowed them to operate efficiently with minimal risk of detection or traceability.

101.    If Defendants had exercised reasonable diligence when operating Subject La Quinta and in the areas where they retained control, Defendants would have prevented the Subject La Quinta from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (B.N.T.). Instead, Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (B.N.T.).

## V.    Defendants' Ventures at the Subject La Quinta

102.    Defendants benefited from use of the Subject La Quinta for sex trafficking. Jane Doe (B.N.T.)'s trafficker and other trafficker rented rooms at the Subject La Quinta and used the hotel to harbor, maintain, and provide victims including Jane Doe (B.N.T.). When these traffickers rented rooms, the respective Defendants received a financial benefit.

103.    Each Defendant generated revenue every time a sex trafficker rented a room at the Subject La Quinta, both from room rental fees and from fees for other hotel services

104.    Each of the Defendants generated substantial income from operations of hotels such as the Subject La Quinta. In exchange for providing the services described above, each of the Defendants received a share of the revenue from room rentals collected at the Subject La Quinta. The fees generated by the Defendants are primarily based on gross room rentals; therefore, the Defendants' revenue increased with each room rental at the Subject La Quinta. Revenue generated

from rooms rented at the Subject La Quinta was distributed among Defendants, with each benefiting from each rental of a hotel room by trafficker.

105. The Defendants also benefited from sex traffickers' frequent use of the Subject La Quinta because this regular and routine use of those hotels increased the hotel occupancy rate, and an increase in the hotel occupancy rate resulted in several benefits for the Defendants.

106. In ways described more fully above, the Defendants knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding with the traffickers operating out of the Subject La Quinta, including Jane Doe (B.N.T.)'s trafficker. (hereinafter "Venture 1").

107. The Defendants formed this continuous business relationship and implicit understanding with the traffickers at the Subject La Quinta by continuing to rent rooms to be used for trafficking (including Jane Doe (B.N.T.)'s trafficking) after Defendants knew or should have known that the rooms were being used for unlawful trafficking.

108. This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Defendants were generating revenue by renting the hotel rooms.

109. This implicit understanding developed because sex traffickers, including Jane Doe (B.N.T.)'s trafficker, frequently used the Subject La Quinta for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Defendants created a favorable environment for sex trafficking to flourish. Multiple traffickers operated at the hotel, and multiple victims were harbored, provided, and exploited at the hotel.

110.    Defendants participated in this venture by acting jointly to rent rooms to traffickers and to operate the hotel in a way that attracted business from traffickers and facilitated their trafficking activity.

111.    The Defendants participated in the venture by continually renting rooms to traffickers, including Jane Doe (B.N.T.)'s, after they knew or should have known that victims like Jane Doe (B.N.T.) were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage trafficker to select the Subject La Quinta as venues for their illegal activities.

112.    The Defendants did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with traffickers, which is evidenced by, among other things:

a.    These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Subject La Quinta but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

b.    Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

c.    Defendants provided additional services to traffickers (including Jane Doe (B.N.T.)'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

113.    The criminal traffickers operating at the Subject La Quinta as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (B.N.T.)

114. If Defendants had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from J.T.A's trafficking at the Subject La Quinta.

115. In ways described more fully above, the Defendants also knowingly received a financial benefit from participating in a commercial hotel-operating venture at the Subject La Quinta (hereinafter "Venture 2").

116. The Defendants jointly participated in operation of the Subject La Quinta with a shared goal of maximizing revenue, including gross room revenue.

117. The Defendants, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the Subject La Quinta by continuing to operate the hotel in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at this hotel.

118. Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at the Subject La Quinta, which resulted in Jane Doe (B.N.T.) and other victims being harbored, maintained, and provided in the rooms of the Subject La Quinta. Venture 2 also engaged in a violation of the TVPRA through the actions of the operating Defendant who violated the TVPRA as perpetrators by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

119. Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Defendants participated in the venture by continuing to operate the Subject La Quinta in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (B.N.T.).

37

**VI.    Defendants are Jointly and Severally Liable for Jane Doe (B.N.T.)'s Damages.**

120.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (B.N.T.).

121.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (B.N.T.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

122.    Jane Doe (B.N.T.) incorporates all other allegations.

**I.    Cause of Action: Beneficiary Liability under §1595(a) of the TVPRA (all Defendants)**

123.    Jane Doe (B.N.T.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

124.    Through acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with trafficker, including Jane Doe (B.N.T.)'s trafficker, despite the fact that each defendant knew or should have known that these trafficker, including Jane Doe (B.N.T.)'s trafficker, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

125.    Through the acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with its respective franchisee regarding

the operations of its respective hotel properties even though Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

126.   Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (B.N.T.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel property.

## TOLLING OF LIMITATIONS

127.   To the extent Defendants assert an affirmative defense of limitations, Jane Doe (B.N.T.) invokes the discovery rule. At the time she was harmed and through at least the end of 2015, Jane Doe (B.N.T.) was under the coercion and control of trafficker who beat her, threatened her, psychologically abused her, exercised coercive control over her, and severely restricted her freedom.  As a result, Jane Doe (B.N.T.) lacked the information and capacity to understand her injuries and their legal causes.

128.   Thus, Jane Doe (B.N.T.) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, Jane Doe (B.N.T.)—through no fault of her own—lacked the information and understanding to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of Jane Doe (B.N.T.) being kept under the control, coercion, and manipulation of her trafficker, which Defendants facilitated.

129.    At the time Jane Doe (B.N.T.) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being "trafficked" at Defendants' hotel or that she was a person "trafficked", much less that she was the

"victim" of a legal venture involving defendants, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

130. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (B.N.T.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (B.N.T.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (B.N.T.) filed this lawsuit.

131. While under the control of her trafficker through at least the end of 2015, Jane Doe (B.N.T.) did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Jane Doe (B.N.T.) could not have pursued her claims while under the active control of her trafficker despite the exercise of ordinary diligence.

132. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (B.N.T.) also invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject location.

133. Jane Doe (B.N.T.) was subject to trafficking at the Subject La Quinta through at least the end of 2015, which is not more than 10 years before Jane Doe (B.N.T.) filed this lawsuit.

134. This continuous trafficking resulted from Defendants' facilitation of trafficking at the Subject La Quinta and Defendants' ongoing ventures with one another and with criminal trafficker at that hotel.

## DAMAGES

135. Defendants' acts and omissions, individually and collectively, caused Jane Doe (B.N.T.) to sustain legal damages.

136.    Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (B.N.T.).

137.    Jane Doe (B.N.T.) is entitled to be compensated for personal injuries and economic damages, including:

a.  Actual damages (until trial and in the future)

b.  Incidental and consequential damages (until trial and in the future);

c.  Mental anguish and emotional distress damages (until trial and in the future);

d.  Lost earnings and lost earning capacity (until trial and in the future);

e.  Necessary medical expenses (until trial and in the future);

f.  Life care expenses (until trial and in the future);

g.  Physical pain and suffering (until trial and in the future);

h.  Physical impairment (until trial and in the future);

i.  Emotional impairment (until trial and in the future);

j.  Exemplary/Punitive damages;

k.  Attorneys' fees; and

l.  Costs of this action.

m.  Pre-judgment and all other interest recoverable.

### JURY TRIAL

138.    Jane Doe (B.N.T.) demands a jury trial on all issues.

### RELIEF SOUGHT

139.    WHEREFORE, Jane Doe (B.N.T.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (B.N.T.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the

evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (B.N.T.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**THE LOCKS LAW FIRM**

DATED: <u>JANUARY 31, 2025</u>

*/s/ Francesca A. Iacovangelo, Esq.*
Francesca A. Iacovangelo, Esq.
601 Walnut Street, Suite 720 E
Philadelphia, PA 19106
(215) 893-3454
(215) 893-3444 facsimile
fiacovangelo@lockslaw.com

ATTORNEYS FOR PLAINTIFF